```
 1                 IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION
   _____
 3                                      )
   UNITED STATES OF AMERICA             )
 4                                      )
                                        ) CRIMINAL ACTION NO.
 5 VS.                                  ) B-08-1248
                                        )
 6 CARLOS MARTINEZ-TELLO                )
   _____)
 7

 8                          SENTENCING
           BEFORE THE HONORABLE ANDREW S. HANEN
 9                     FEBRUARY 24, 2010
                          VOLUME 3
10

11 APPEARANCES:

12 For the Plaintiff:          MR. OSCAR PONCE
                               Assistant United States Attorney
13                             Brownsville, Texas  78520

14 For the Defendant:          MR. ANTHONY TROIANI
                               700 Paredes, Suite 107
15                             Brownsville, Texas

16

17 THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
   CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT
18 ORDER.  UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT
   AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE
19 OFFICIAL RATE.
   General Order 94-15, United States District Court, Southern
20 District of Texas.

21
   Transcribed by:             BARBARA BARNARD
22                             Official Court Reporter
                               600 E. Harrison, Box 301
23                             Brownsville, Texas  78520
                               (956)548-2591
24

25
```

1          THE COURT:  All right.  B-08-1248, United States of

2    America versus Carlos Martinez-Tello.

3          MR. PONCE:  Oscar Ponce for the government.

4          MR. TROIANI:  Your Honor, Anthony Troiani for

5    Mr. Martinez-Tello.

6          THE COURT:  Rebecca, why don't we have him go ahead and

7    take a seat right there, because this may --

8        *(Defendant present.)*

9          THE COURT:  All right.  Counsel, are we ready to

10   proceed?

11         MR. TROIANI:  Yes, Your Honor.

12         MR. PONCE:  Yes, Your Honor.

13         THE COURT:  What seems to be the best way to do that?

14   Given the objections, Mr. Ponce, for you to go ahead and give me

15   a little background, or, Mr. Troiani, you give me a little

16   background and then hear the witnesses?

17         MR. PONCE:  Yes, sir.

18         THE COURT:  All right.

19         MR. PONCE:  Well, first of all regarding the objections,

20   what we expect to introduce to the court today would be the --

21   of course the lab report which does show the purity.  I know

22   that that doesn't actually affect the advisory guideline level

23   per se, but the purity level is at 85.1.

24       The other objection that was mentioned by the defense

25   concerns the incident mentioned in paragraph 38 of the PSI where

1   he was initially arrested for possession with intent to

2   distribute heroin.  That case was -- that was a DPS case that

3   was investigated in '98 and ultimately turned over to DEA, and

4   eventually that case was dismissed.

5       I have since learned that this is a case where -- where the

6   defendant was, in fact, involved and did participate in the --

7   in that case, that incident, except for that he and another

8   individual delivered a simulated controlled substance that

9   turned out not to be heroin, and that's why it was not

10  prosecuted federally.

11      The agent will testify he doesn't remember exactly why it

12  was not then referred to the state authorities to be filed as a

13  state offense because it is a violation, a criminal violation of

14  attempting to deliver a simulated controlled substance under

15  Texas law, and he simply doesn't remember that part of the case.

16  But he does -- and, in fact, we have photos of the defendant at

17  the time of his arrest back in '98 to establish that it is he

18  and that the incident did involve undercover officers who were

19  in the process of attempting to purchase what turned out to be

20  the simulated controlled substance from the defendant and

21  another individual.  And we have witnesses ready for that, if

22  necessary.

23      The other matter that was brought up was the relevant

24  conduct.  In this case, the defendant was charged with

25  possessing a certain amount of cocaine.  The PSI in paragraph --

1    in paragraph 23 assesses an additional two points because of

2    relevant conduct is assessed based on an earlier incident.  That

3    earlier incident is an incident that occurred in or about August

4    of that year of 2008, and we have the co-defendant who

5    participated with him in that particular incident ready to

6    testify.

7        The co-defendant will testify that they took the cocaine up

8    north.  She didn't know the amount, but that thereafter, she got

9    paid four or $5,000.  I don't remember exactly what figure it

10   was, but some amount of money afterwards.  And based on the

11   nature of the trip, the similarity of the trips and whatnot, the

12   probation officer assessed an equal amount of cocaine for that

13   trip to then give the defendant relevant conduct.

14       I would point out to the court that this particular case

15   where -- where the cocaine that was, in fact, seized, was about

16   13, 14 or so kilograms, and it only would take another kilogram

17   or so to bring it up to the 15 or more to bring it up to the

18   next level that would, in fact, give him two points; that we

19   believe that it would be reasonable to, in fact, based on the

20   information, to have the court conclude that for purposes of

21   relevant conduct, there should be an almost equal amount of

22   cocaine on that earlier load and, therefore, relevant conduct is

23   properly assessed.

24       And finally, the other objection that he filed here or

25   requested, that he makes here is a request for -- for

1   essentially safety valve debriefing.  The defendant did do a

2   safety valve debrief, but we submit to the court that that was

3   not a truthful debriefing based on the information that we have

4   up to this point.

5        THE COURT:  Okay.  Mr. Troiani, you want to respond to

6   any of that?

7        MR. TROIANI:  Sure, Your Honor.  And if I may, our

8   concern with the dismissed conduct is set out in our objection.

9   Obviously this conduct -- and this is the 1997, 1998 dismissals,

10  Your Honor.  And if the court looks at paragraph 5 of our

11  objections --

12       THE COURT:  I have read them.

13       MR. TROIANI:  Okay.  Basically the PSR indicates that

14  they were dismissed for unknown reasons.  And that's

15  paragraph -- page 15, paragraph 86 of the PSR, Your Honor.  And

16  consideration of prior arrests by a district court in

17  sentencings is considered error.  I cite the court to *United*

18  *States versus Jones*, 444, F3d. 430 at page 436, Fifth Circuit.

19  Previous arrests that did not result in convictions could not be

20  considered in criminal history calculations, citations, and that

21  was also filed -- *Williams versus United States*, 503 U.S. 193,

22  199 to 301.

23       Essentially Mr. Ponce is trying to bring up cases that were

24  dismissed that have no bearing on this transaction to add on

25  criminal conduct and to influence the court as far as

 1    sentencing.  There was a request for an upward departure.

 2         Given the fact that they were dismissed, these are cases

 3    that were 1997, 1998 respectively.  They have nothing to do with

 4    this transaction.  Your Honor, we feel that this is

 5    inappropriate.  And further, there is a concern as far as the --

 6    and I understand they do have witnesses here today.  But these

 7    issues were never presented to court and, in fact, were

 8    dismissed.  No additional litigation was had as a result of

 9    these transactions.  And for them now to try to prove that up

10    outside of the time frame, outside of any connection with that

11    transaction is a little late.

12         THE COURT:  Okay.

13         THE INTERPRETER:  Your Honor, the defendant was not

14    wearing a headset, so I assumed he was speaking English.  He

15    tells me now that he has not understood a word because he didn't

16    have a headset, and he wants to know what Mr. Ponce said.

17         MARSHAL:  Your Honor, I apologize.  We had a problem

18    with one of the witnesses, and I forgot to ask.

19         THE COURT:  All right.  Mr. Martinez, let me -- first of

20    all, let me assure you that nothing has been decided.  And

21    you're welcome to sit there because we're going to hear some

22    witnesses, and I just thought it was more convenient to have you

23    sit there than stand there next to Mr. Troiani because he's

24    going to actually be seated here in a minute.

25         Let me recap and summarize.  The government is claiming

1    basically three or four things.  One, that the court should

2    consider, at least in part, the arrests that occurred back in

3    1998 that you -- that were -- charges were filed in federal

4    court but then dismissed because it wasn't -- there wasn't a

5    real drug involved.  It was a simulated drug, and that the court

6    should somehow consider that when it sentences you.

7        Secondly, the government is arguing that the relevant

8    conduct from prior trips ought to count as relevant conduct when

9    we -- when I sentence you, and that's already been included in

10   the PSI, so you're familiar with their position on that.

11   Obviously Mr. Troiani, in your behalf, has objected to that.

12       And then third, the government is going to take the position

13   that you don't qualify for safety valve because the debriefing

14   you gave was not forthright and honest.

15       And I think that basically brings you up to date from where

16   we were.  And if you have a problem with the headphones in the

17   future, let me know, and we'll -- immediately and we'll stop and

18   make sure they're working.  But you're hearing us fine right

19   now?

20               THE DEFENDANT:  Yes.

21               THE COURT:  Okay.  All right.  Good.

22       All right.  Mr. Ponce?

23               MR. PONCE:  The other thing that I'd mentioned to the

24   court is the -- we have the lab report for the purity level of

25   the cocaine, which we submit to the court is 85.1.

```
 1              THE COURT:  Okay.  And there was also the issue about

 2  the purity of the cocaine, although I think, quite frankly, in

 3  this scenario, that doesn't really --

 4              MR. TROIANI:  Well, that was --

 5              MR. PONCE:  It doesn't affect the advisory guideline

 6  level, Your Honor, but since he objected to that, I felt that,

 7  well, we were going to present the actual report to show that

 8  that is as stated by the probation office.

 9              THE COURT:  All right.  Mr. Ponce, why don't you go

10  ahead, and let's hear from your witnesses, and then let's come

11  back and address these issues --

12              MR. PONCE:  Yes, sir.

13              THE COURT:  -- with Mr. Martinez.

14              MR. PONCE:  I would like to call to the stand Robert

15  Zamarano.

16              THE COURT:  Come right up here, sir.

17      (Witness sworn.)

18              THE COURT:  Go ahead and be seated.

19      Go ahead, Mr. Ponce.

20                          ROBERT ZAMARANO,

21  the witness, having been first duly cautioned and sworn to tell

22  the truth, the whole truth and nothing but the truth, testified

23  as follows:

24                          DIRECT EXAMINATION

25  BY MR. PONCE:
```

1  Q   Sir, would you state your full name and how you're employed.

2  A   My name is Robert Zamarano.  And at the time of this

3  incident, I was employed with the Texas Department of Public

4  Safety, narcotics service.

5  Q   Assigned where?

6  A   In Harlingen.

7  Q   Harlingen, Texas?

8  A   That's correct.

9  Q   What were your -- and we're talking about the period back in

10 April of 1998, correct?

11 A   That's correct.

12 Q   What were your duties back then?

13 A   My duties as a narcotic investigator was to enforce federal,

14 state, and local laws.

15 Q   And in that -- as part of your duties then, did you on

16 occasion have the task of doing some undercover work, in other

17 words, portraying yourself and fellow agents perhaps as

18 individuals who were in the business of either selling drugs or

19 buying drugs from individuals that were actually selling those

20 drugs?

21 A   Numerous times, yes, sir.

22 Q   So I'm going to ask you about specifically a particular case

23 back on April 22nd of 1998.  Do you -- were you involved in that

24 particular case?

25 A   Yes, sir, I was.

1  Q    Did that particular case also involve an individual named

2  Carlos Martinez-Tello?

3  A    That's correct, sir.

4  Q    And just in general terms, what was the nature of that

5  particular case or investigation you were involved in?

6  A    Investigator Ruben Molina is the officer that initiated,

7  started this investigation.  He asked me that he had received

8  information from a source that --

9        MR. TROIANI:  Your Honor, I'm going to object to any

10  hearsay.

11        THE COURT:  Overruled.

12  BY MR. PONCE:

13  Q    Go ahead.

14  A    That wanted to deliver a narcotic substance.  He asked me to

15  back him up as a -- on this investigation in an undercover

16  capacity.

17  Q    In an undercover capacity, then you were -- you and he were

18  then going to be making arrangements to meet with certain

19  individuals to be provided with certain controlled substance?

20  A    That's correct, sir, yes.

21  Q    And what was that substance represented to you-all to be?

22  A    Heroin.

23  Q    Okay.  So -- and this is an investigation that's taking

24  place in what area?

25  A    Just south of San Benito on Expressway US 77.

1   Q   Okay.  So here in Cameron County?

2   A   Cameron County.

3   Q   So tell me what is the -- since you are now partnering up

4   with Investigator Molina, what is the plan that you-all have in

5   terms of what's going to happen?  And then later I'm going to

6   ask you about what you-all did when you-all showed up and

7   whatnot.

8   A   Of course, we set a time and location to meet the

9   individuals.  When we did, more or less say as the plan was

10  after we're meeting the individuals, and if they would have

11  showed up with the -- the exhibit, we were -- we decided to

12  inform the individuals to follow us so that we could deliver the

13  monies for the exhibit; at that time get a black and white to

14  stop the vehicle in traffic.

15  Q   They were going to do a traffic stop once you-all had seen

16  the substance?

17  A   Yes, sir.

18  Q   And you keep referring to it as an exhibit, but that's not

19  how you referred to it back then, did you?

20  A   No, sir.  The heroin.

21  Q   Okay.  And so that's the plan.  Is that then why you-all met

22  at that location on April 22nd of 1998?

23  A   Yes, sir.

24  Q   Do you remember how much you-all were going to pay for that

25  heroin?

```
1    A    I don't recall, sir.  I don't.

2    Q    And do you remember how much you-all were going to buy?

3    A    No, sir.

4    Q    Okay.  Not from personal knowledge, but did you have a

5    chance to read some reports to determine how much that was going

6    to be?

7    A    Just over a pound of heroin.

8    Q    Okay.  Half a kilo?

9    A    Yes, sir.

10   Q    Okay.  And so those are the plans.  Now, is -- who else is

11   involved as part of this case that's being investigated?  Is it

12   just you and Molina to show up there, or do you have other

13   individuals that are somehow or another assisting you in other

14   capacities?

15   A    As I can recall, we had other investigators from DPS and DEA

16   doing the surveillance of the undercover meet.

17   Q    Okay.  And did you-all then show up to this place where the

18   showing of what was purported to you-all to be heroin was going

19   to take place?

20   A    Yes, sir.

21   Q    Where was it?

22   A    Cameron County, south of San Benito on U.S. 77 Expressway,

23   the -- on the side of the highway.

24   Q    Is that like a rest stop?

25   A    Similar to a rest stop.  It's got some large blacktop
```

1   shoulders that I guess trucks stop there to rest.

2   Q   Okay.  So you and Investigator Molina show up?

3   A   Yes, sir.

4   Q   Obviously in just plain clothes and a regular vehicle?

5   A   That's correct.

6   Q   What happens then?

7   A   At the time we noticed the description of the vehicle that

8   Sergeant Molina had, a large four door, I believe it's going to

9   be a Ford or Lincoln vehicle, already on the side of the road

10  waiting.

11  Q   Okay.  So did you-all then meet with the occupants of that

12  vehicle?

13  A   Yes, sir.  I remember exactly that we pulled behind this

14  vehicle.

15  Q   Okay.  Then who does the preliminary meet or contact with --

16  with the individuals in this vehicle?

17  A   Investigator Molina.

18  Q   Okay.  Is taking the lead?

19  A   Yes, sir.

20  Q   Do you stay in the vehicle, or at some point do you also get

21  out?

22  A   I also exit the vehicle at the same time Sergeant Molina

23  did.

24  Q   And what -- what happens once you exit the vehicle?

25  A   We all met, confronted each other, and I just listened to

1   Officer Molina talk to Mr. Martinez.

2   Q   And just tell us, what was the nature of what was being

3   discussed there in general terms?

4         MR. TROIANI:  Your Honor, I'm going to again object to

5   hearsay.  He's obviously not the one participating.  It's

6   obvious the statements weren't made to him.  Obviously it's

7   third party information.

8         THE COURT:  All right.  I'm going to overrule it.

9         THE WITNESS:  Can you repeat that, sir?

10   BY MR. PONCE:

11   Q   What was the nature of what was being discussed there?  And

12   I'm not asking you to tell me word for word.  I don't know if

13   you would remember that, but just in general terms.

14   A   Well, we met, shook hands.  What really I remember about

15   this case is one individual was wearing a Kansas State Police

16   Training Academy T-shirt.  And I immediately asked him, "Are you

17   the -- you're the police, right?  You're the police?"  And he --

18   I mean, he said, "No, no, I'm not the police."

19       "Well, you're wearing a shirt that's a police officer."  And

20   from there we sort of broke the ice and started laughing and

21   moved on and negotiated for the narcotics, the heroin.

22   Q   So you participated in that conversation?

23   A   Yes, sir.

24   Q   And, of course, you mentioned this just as a way, as you

25   say, to break the ice or whatever, not because you really

1   thought that the person was a law enforcement officer?

2   A   Right.  I think when I mentioned that and we all joked and

3   laughed, everything was relaxed.  And we proceeded, and it was

4   an easy transaction and negotiation after that.

5   Q   So were you-all shown what's purported to y'all to be the

6   controlled substance?

7   A   Mr. Martinez first showed it to Sergeant Molina while I was

8   visiting with the other individual.  And then Sergeant Molina

9   waved me in to go over to him and view the heroin.

10  Q   What you thought was heroin?

11  A   What we thought was heroin, yes.

12  Q   What was told to y'all to be heroin?

13  A   Yes, that's correct, sir.

14  Q   Now, were you-all going to pay -- as part of the plan, were

15  you-all going to be paying for it right then and there and

16  exchanging it right then and there?

17  A   Not right there and then.  We informed them to follow us so

18  that we can pick up the money and pay them for the -- the

19  heroin.

20  Q   Okay.  So did you-all then get into your individual

21  vehicles?

22  A   Yes.

23  Q   And where did you-all head?

24  A   We headed north on 77 into San Benito in Cameron County.

25  Q   And once you-all got in your vehicle and started heading in

1    that direction, did you-all radio to anyone as part of the plan?

2    What was going to happen?

3    A    Yes, we informed Mr. Martinez to follow us.  And as we are

4    traveling north on 77 towards San Benito, we inform Trooper

5    Martinez, the trooper, to go ahead and stop the vehicle in

6    question and inform him that the heroin was, you know, in the

7    dash of the vehicle.

8    Q    Okay.  And -- so a traffic stop was going to be made?

9    A    Yes.

10   Q    And you-all continued on your way?

11   A    Yes, sir.

12   Q    That is essentially the extent of your involvement in this

13   case?

14   A    Yes.  We left the trooper to follow and continue with the

15   investigation, and we left the area.

16   Q    And, of course, you learned that based on you-all's request

17   and plan, that the individuals were, in fact, arrested and the

18   substance was discovered, correct?

19   A    That's correct.

20   Q    Did you have an opportunity to see them later also at the

21   processing place, DPS or wherever?

22   A    No, sir.

23   Q    Now, I'm going to show you --

24          MR. PONCE:  May I approach the witness, Your Honor?

25          THE COURT:  You may.

1   BY MR. PONCE:

2   Q   I'm going to show you two photographs.  I'm going to tape

3   them to a sheet, so I'll call these Exhibit 1 because they'll be

4   taped to a sheet.  And there's a photograph on the left and a

5   photograph on the right.  Can you look at these and tell me if

6   you recognize these?

7   A   Yes, sir.  It's a picture of Mr. Martinez and a picture of

8   Mr. Lopez wearing that Kansas Law Enforcement Training Academy

9   T-shirt.

10  Q   So these are the individuals that you-all dealt with back in

11  1998?

12  A   Yeah, that's correct.

13  Q   Okay.  And, of course, having looked at these photographs

14  and refreshed your memory, did -- the individual you identified

15  as -- as Carlos Martinez-Tello, is he in this courtroom?

16  A   Yes, he is.

17  Q   Could you please point him out to me and tell me where he's

18  seated, what he's wearing?

19  A   He is seated on my right, short hair, with -- he's got the

20  headphones.

21          MR. PONCE:  Your Honor, for the record, he's identified

22  the defendant.

23          THE COURT:  The record will so reflect.

24  BY MR. PONCE:

25  Q   Was the substance or the case then later turned over by DPS

1   to another agency that was assisting?

2   A   Yes.  It was turned over to DEA.

3   Q   And as part of the case, the substance that was seized, was

4   that taken over to the lab?

5   A   It was taken over to the lab by the investigating officer,

6   which was Ruben Molina.

7   Q   Of course, you later -- you subsequently found out that --

8   that the substance turned out to be --

9           MR. TROIANI:  Your Honor, I'm going to object to the

10  improper predicate.  I'm also going to object to hearsay as far

11  as any information regarding the substance or what happened to

12  it after it left his care, custody and control.

13          THE COURT:  I'm going to overrule it.

14  BY MR. PONCE:

15  Q   I'll repeat it.  What the substance turned out to be,

16  controlled substance, heroin, or was it just something that was

17  a simulated controlled substance?  It wasn't a controlled

18  substance?

19  A   At the end after the results of the tests, it was found that

20  it was a simulated type of substance.

21  Q   Okay.  Did you, as the state agency or your agency, DPS,

22  state agency, did you-all ever then refer this to the state

23  authorities for prosecution the best that you remember?  And if

24  not, why not?

25  A   I don't remember.  I was not the leading investigating

1    officer in this case.  That would have been Ruben Molina.

2    Q    Is that the extent of what you did in this case?

3    A    Yes, sir.

4         MR. PONCE:  Okay.  I'll pass at this time, Your Honor.

5         THE COURT:  Any questions, Mr. Troiani?

6         MR. TROIANI:  Yes, Your Honor.

7                        **CROSS-EXAMINATION**

8    BY MR. TROIANI:

9    Q    Good morning, Mr. Zamarano.

10   A    Good morning.

11   Q    This investigation occurred in 1997 or 1998?

12   A    '98, sir.

13   Q    1998.  And as you stated, you were not the lead investigator

14   on this case?

15   A    That's correct, sir.

16   Q    Okay.  And that would have been Mr. Molina, correct?

17   A    Yes, sir.

18   Q    Is he still with DPS?

19   A    He's retired also.

20   Q    He retired also.  Are you retired?

21   A    Yes, sir.

22   Q    And are you currently employed in any capacity with either

23   DPS or DEA or any -- or are you simply retired from law

24   enforcement?

25   A    I'm with the FBI HIDTA at this time as a criminal analyst.

1  Q   Now, sir, at the time that you were involved in this

2  investigation, you turned it over to DEA, correct?

3  A   Officer Molina did.

4  Q   Okay.  And it's your understanding that this investigation

5  was not prosecuted, correct?

6  A   That's correct.

7  Q   Okay.  It's also your understanding that it was not turned

8  over to any state authorities as well, correct?

9  A   I understand that's correct.

10 Q   Okay.  Were you involved in any discussions as to whether or

11 not this matter should be prosecuted based on the reports that

12 you provided, based on -- did you prepare -- well, let's back

13 up.

14     Did you prepare a report as part of this investigation?

15 A   No, sir, I did not.

16 Q   Okay.  Did you -- you didn't -- you did not prepare a

17 report.  You didn't take any statements, correct?

18 A   That's correct.

19 Q   Okay.  And any information that was presented on this -- on

20 this investigation would have been done by Mr. Molina, correct?

21 A   That's correct, sir.

22 Q   Okay.  Were you involved with DEA, with the U.S. Attorney's

23 office in reviewing this case for prosecution?

24 A   No, sir, I was not.

25 Q   Okay.  So you don't know if either DEA or the U.S.

1    Attorney's office determined that there may have been a

2    violation of the defendant's rights, correct?

3    A    Correct.

4    Q    You don't know whether or not there was an error in your

5    investigation process which caused the U.S. Attorney's office or

6    the DEA to decide to toss this case, correct?

7    A    That's correct.

8    Q    And you don't know whether or not, based on other

9    information, the U.S. Attorney's office or the DEA decided in

10   the interest of justice to toss this case; is that correct?

11   A    That's correct.

12   Q    And you can't make any opinion or have any comment as to any

13   of those rationales for tossing this case, correct?

14   A    Right.

15   Q    All you know is that you participated in an investigation,

16   and that investigation went nowhere?

17   A    That's correct, sir.

18        MR. TROIANI:  I'll pass the witness.

19        MR. PONCE:  I just have one question.

20   May I approach the witness, Your Honor?

21        THE COURT:  You may.

22                       **REDIRECT EXAMINATION**

23   BY MR. PONCE:

24   Q    Let me show you Government's Exhibit No. 2.  And you

25   recognize that?  If you do, that's fine.  If you don't --

1    A    Yes, I do.   I do.

2    Q    And what -- what is that?

3    A    That was -- was the item they delivered, supposed to be

4    heroin, in a Tupperware container.

5              MR. PONCE:   Your Honor, move to admit 1 and 2 if I

6    haven't already done so.   Move to admit 1 and 2, which is the

7    photograph previously identified and then another photograph of

8    the substance that was seized.

9              MR. TROIANI:   No objections for purposes of this

10   hearing, Your Honor.

11             THE COURT:   All right.   They will be admitted.

12             MR. PONCE:   Your Honor, I have nothing further.

13             MR. TROIANI:   Your Honor, may I just very briefly ask

14   one other question?

15             THE COURT:   Yes.

16                        **RECROSS-EXAMINATION**

17   BY MR. TROIANI:

18   Q    Sir, any basis for this case not being pursued by either

19   DEA, the U.S. Attorney's office, or the state authorities would

20   be complete speculation on your part; is that correct?

21   A    That's correct.

22             MR. TROIANI:   Thank you.

23             THE COURT:   All right.   Thank you, sir.   You may step

24   down.

25             THE WITNESS:   Thank you.

1          MR. PONCE:  Agent George Delaunay.

2          THE COURT:  Mr. Delaunay, if you would.

3      *(Witness sworn.)*

4          THE COURT:  You can be seated.

5          THE WITNESS:  Thank you, sir.

6                    **GEORGE DELAUNAY,**

7  the witness, having been first duly cautioned and sworn to tell

8  the truth, the whole truth and nothing but the truth, testified

9  as follows:

10                  **DIRECT EXAMINATION**

11 BY MR. PONCE:

12 Q   Sir, would you --

13         MR. PONCE:  I'm sorry.  May I proceed, Your Honor?

14         THE COURT:  You may.

15 BY MR. PONCE:

16 Q   Sir, would you please state your full name and how you're

17 employed?

18 A   My name is George Delaunay.  I'm employed as a federal agent

19 with the Drug Enforcement Administration here in Brownsville.

20 Q   And how long have you been with DEA, sir?

21 A   24 years.

22 Q   So back in April of '98, were you, in fact, assigned to the

23 DEA here in the Brownsville area?

24 A   Yes, sir.

25 Q   Back in April of '98, did you have occasion to assist DPS in

1   an undercover operation that they were conducting for the

2   purchase of drugs?

3   A   Yes, I did.

4   Q   Was it -- is it routine for your agency to assist other

5   local agencies in some capacity or other as they conduct

6   investigations?

7   A   Yes.  We normally work jointly, hand-in-hand with DPS

8   Narcotics Service.

9   Q   In -- back on April 22nd of 1998, were you assisting DPS in

10  an undercover operation that they were conducting that led to

11  the arrest of an individual named Carlos Martinez-Tello and

12  Leonel Lopez-Aparicio?

13  A   Yes, sir, I was.

14  Q   And when did you first become involved in that

15  investigation, and how -- what was your role?

16  A   What I recall is I was part of the surveillance team that

17  was out there on the street with them at the time.

18  Q   Okay.  Back then, were you briefed on the nature of the

19  investigation that was taking place?

20  A   Yes.  It was a heroin, an attempted heroin purchase.

21  Sergeant Molina and Sergeant Zamarano were acting in an

22  undercover capacity in this case.

23  Q   And you said that -- that you assisted in the surveillance

24  part?

25  A   Correct.

1   Q    Do you remember what area you and others were -- were

2   keeping under surveillance?

3   A    Yes.  It was just south of San Benito, just south of the 732

4   overpass off of Highway 77.  On the right-hand side if you're

5   going north, there's like a little rest stop there where usually

6   18 wheelers and other vehicles park.

7   Q    And according to the plan, what was going to happen that you

8   were supposed to be surveilling, that you were supposed to be

9   watching?

10  A    We were covering the meeting between the undercover officers

11  and the defendant.

12  Q    That meeting take place?

13  A    Yes.

14  Q    And as part of that, if you remember, how long was that

15  meet?

16  A    I don't think it was very long.  I would say maybe -- and

17  I'm guessing here, maybe like ten, ten minutes maybe the

18  longest.

19  Q    Now, I don't know if you remember this or -- because you do

20  or because you refreshed your memory in perhaps reading a

21  report, but did you remember what vehicle showed up to meet with

22  the undercover officer?

23  A    I refreshed my memory from the report, and it was a dark

24  blue colored Lincoln Town Car, a 1986, I believe.

25  Q    And it was driven by whom?

```
1    A    Carlos Martinez-Tello, I believe.

2    Q    And is this the vehicle then that was later subjected to a

3    traffic stop by a marked DPS unit?

4    A    Yes.

5    Q    The -- of course, the two individuals that you mentioned

6    earlier were, in fact, arrested as part of that case, correct?

7    A    Yes, sir.

8    Q    And the substance was seized?

9    A    Yes, sir.

10   Q    Were these individuals then, the substance then taken to

11   either y'all's offices or DPS offices for further processing?

12   A    Yes.  They were taken to the Texas Department of Public

13   Safety office in Harlingen.

14   Q    And while in Harlingen, did you continue to assist DPS

15   officers as part of that investigation?

16   A    Yes, sir, I did.

17   Q    Did you have an opportunity to then actually meet with and

18   talk to the individuals that had been apprehended?

19   A    Yes.

20   Q    And, of course, that being Lopez-Aparicio and that being

21   Martinez-Tello?

22   A    Yes, correct.

23   Q    I'm going to ask you then specifically about Martinez-Tello.

24   Did you -- did you read his rights to him?

25   A    Yes, I read him the Miranda warnings.
```

1    Q    Did he agree to talk to you?

2    A    He did.

3    Q    What did he tell you regarding where they were going prior

4    to the traffic stop that had been conducted by DPS?

5    A    I believe he told us that he was giving his friend a ride to

6    San Benito.

7    Q    And where were they going?

8    A    To a transmission shop.

9    Q    Now, that's inconsistent with what you knew the plan to be

10   because they were presumably following Molina and Zamarano?

11   A    Correct.

12   Q    Now, did you ask him -- and by "him," I mean Martinez-Tello,

13   about the substance that had been seized from his car?

14   A    Yes.

15   Q    What did he tell you about that?

16   A    I believe he denied knowing any knowledge of it.

17   Q    Did you ask him if -- if he had stopped anywhere along the

18   road after he left his residence?

19   A    Yes, and he told me that he stopped on the side of the road

20   to check a tire, I believe.

21   Q    And they were -- did he tell you how long they were there?

22   A    I don't recall that.  If I could look at my report, I could

23   check and see.

24        MR. PONCE:  Your Honor, I'll ask the witness to refresh

25   his memory, Your Honor.

```
 1              THE COURT:  Go ahead.
 2              THE WITNESS:  Thank you.  I have in my report that they
 3     were there for about a minute and then continued on to San
 4     Benito.
 5     BY MR. PONCE:
 6     Q    Now, you -- that's what he said or that you observed him
 7     there?  Let's make this --
 8     A    This is what he told me.
 9     Q    That he was there for about a minute and then continued
10     where?
11     A    To San Benito.
12     Q    Okay.  Now, did he say anything at all about meeting with
13     these other two individuals who were the individuals you
14     happened to know as the undercover officers?
15     A    No.
16              MR. TROIANI:  Your Honor, I'm going to object to
17     relevance as to the purposes of this sentencing hearing.
18              THE COURT:  Why don't we get right to the purpose.
19              MR. PONCE:  I'm -- yes, Your Honor.  I'm just trying to
20     do that.
21     BY MR. PONCE:
22     Q    Now, did that essentially conclude your interview with
23     Carlos Martinez-Tello?
24     A    Yes, sir.
25     Q    In going back to recall this case, did you provide us with
```

1    photographs?

2    A    Yes.

3    Q    And I'm going to show you Government's Exhibit No. --

4           MR. PONCE:   May I approach the witness, Your Honor?

5           THE COURT:   You may.

6    BY MR. PONCE:

7    Q    No. 1.  Government's Exhibit No. 1 actually has two photos.

8    One is on the left, and one is on the right.  And do you

9    recognize Government Exhibit No. 1?

10   A    Yes, I do.

11   Q    Okay.  What is that?

12   A    Photographs of Carlos Martinez-Tello and Leonel Lopez.

13   Q    Okay.  And what about Government Exhibit No. 2?

14   A    Yes.  That was the container with the alleged heroin.

15   Q    Okay.  And you provided these photos from your file?

16   A    Yes, I did.

17   Q    By the way, the driver of that vehicle and the individual

18   that you identified as Carlos Martinez-Tello, is he in this

19   courtroom today?

20   A    Yes, he is.

21   Q    Would you please point him out to me and tell me where he's

22   seated, what he's wearing?

23   A    Yes.  He's sitting to the left of Mr. Troiani in the orange

24   jumpsuit.

25           MR. PONCE:   Your Honor, for the record, he's identified

1    Mr. Martinez-Tello.

2            THE COURT:  The record will so reflect.

3    BY MR. PONCE:

4    Q    Now, this case was subsequently turned over to you-all --

5    and "to you-all," I mean DEA -- for further processing and

6    prosecution, correct?

7    A    Yes.

8    Q    In fact, you were then the designated case agent, correct?

9    A    Yes, sir.

10   Q    At some point in time then, the -- you received the

11   information concerning the analysis of the substance that had

12   been seized?

13   A    Yes.

14   Q    And can you tell us whether that turned out to be cocaine --

15   or, I mean, heroin or not?

16   A    The lab report reported that it was not heroin.

17   Q    Okay.  So this was a -- what then is known as a simulated

18   controlled substance?

19   A    Yes.

20   Q    Could you tell us, if you remember then, whether you-all

21   then turned around and presented this case either back to DEA --

22   to DPS for state prosecution or whether you-all directly then

23   presented it for state prosecution under the --

24           MR. TROIANI:  Objection, leading.

25           THE COURT:  Overruled.

| | |
|---|---|
| 1 | THE WITNESS:  I don't remember.  As far as my rule, once |
| 2 | the U.S. Attorney's office dismissed the federal charges, I |
| 3 | didn't -- I don't recall ever discussing it with DPS, whether we |
| 4 | should go state or not.  I just don't remember. |
| 5 | BY MR. PONCE: |
| 6 | Q   Okay.  By the way, the amount of this substance was about a |
| 7 | pound, pound-and-a-half or so? |
| 8 | A   Yes, sir. |
| 9 | Q   Pound-and-a-half? |
| 10 | A   Yes.  That's correct. |
| 11 | MR. PONCE:  Okay.  I have nothing further, Your Honor. |
| 12 | THE COURT:  Mr. Troiani? |
| 13 | MR. TROIANI:  Thank you, Your Honor. |
| 14 | **CROSS-EXAMINATION** |
| 15 | BY MR. TROIANI: |
| 16 | Q   Good morning, Mr. Delaunay. |
| 17 | A   Mr. Troiani, good to see you. |
| 18 | Q   You too.  Sir, back in 1998, you indicated that you |
| 19 | participated in the surveillance, and then you were also the |
| 20 | designated case agent; is that correct? |
| 21 | A   Yes.  Once we determined that we would go federal with the |
| 22 | charges, then I became the case agent at that point. |
| 23 | Q   Okay.  Under the federal statute, you can prosecute for |
| 24 | simulated substances, can you not? |
| 25 | A   I believe so, yes. |

1   Q   Okay.  And you turned over the information that you had, the

2   reports.  Did you prepare reports at that time?

3   A   I did.

4   Q   And you turned those over to an AUSA, right?

5   A   I turned it over to the U.S. Attorney's office, that's

6   correct.

7   Q   Okay.  And then they made a determination not to proceed

8   with this case?

9   A   Correct.

10  Q   Okay.  And they have the capacity to proceed under simulated

11  substances?

12  A   I believe so, yes.

13  Q   And they didn't give you any other information as to why

14  they were not going to pursue this case, did they?

15  A   The only thing I recall, AUSA Mark Dowd was the prosecutor

16  at the time, and he said based on the lab results, that he was

17  going to dismiss the case.

18  Q   Okay.  He didn't give you any other direction or information

19  regarding that, and there was nothing on the case file saying

20  the reasoning other than that issue for dismissal of the case?

21  A   I don't remember anything else.  I know I wrote a report

22  saying that it was dismissed based on the lab report not

23  indicating that it was heroin.

24  Q   Okay.  And it was never presented, to your knowledge, to the

25  state authorities?

1    A    No.  I don't know for sure what resulted from that.

2    Q    Okay.  But at least you did not participate in any attempt

3    to prosecute this at the state level?

4    A    Correct.

5    Q    Okay.  And you're not aware if Mr. Dowd attempted to have

6    the state authorities pick up this case?

7    A    I'm not aware of that.

8    Q    Okay.  And any opinion that you might have would be

9    speculation as to what he did with this case after he told you

10   that he was not going to take it up at the federal level?

11   A    Yes.

12   Q    Okay.  And there was not, to your knowledge, any further

13   prosecution of Mr. Martinez-Tello as a result of your

14   investigation?

15   A    Correct.

16   Q    And that was not part of a plea bargain agreement?

17   A    Correct.

18   Q    And the merits of the decision-making process rely solely

19   with the AUSA's office?

20   A    Yes.

21   Q    And limited information you received was that they weren't

22   going to pursue it, and you don't know if they attempted to

23   pursue it with state authorities?

24   A    That's correct.

25            MR. TROIANI:  Thank you, sir.

1    MR. PONCE:  I have nothing further, Your Honor.

2    THE COURT:  Mr. Delaunay, you can step down.  Thank you.

3    THE WITNESS:  Thank you, Judge.

4    THE COURT:  Are we hearing from anyone else, Mr. Ponce?

5    MR. PONCE:  Yes, Your Honor.  I would call Maria Rosario

6    Garcia.

7    THE COURT:  Come right up here to the witness stand,

8    ma'am.

9    You speak English, don't you?

10    THE WITNESS:  Yes, sir.

11    THE COURT:  I thought you did.  Go ahead and stand and

12    be sworn.

13    *(Witness sworn.)*

14    THE COURT:  Go ahead, Mr. Ponce.

15                     **ROSARIO MARIA GARCIA-GARCIA,**

16    the witness, having been first duly cautioned and sworn to tell

17    the truth, the whole truth and nothing but the truth, testified

18    as follows:

19                     **DIRECT EXAMINATION**

20    BY MR. PONCE:

21    Q   Ma'am, would you state your full name and how you're

22    employed if -- that's my standard question, I'm sorry.  State

23    your full name for the record.

24    A   Rosario Maria Garcia-Garcia.

25    Q   And you're currently incarcerated based on the charge as

1  co-defendant with Carlos Martinez-Tello?

2  A   Yes, sir.

3  Q   What did you do prior to your incarceration?  How were you

4  employed, if you were?

5  A   I got caught with contraband.

6  Q   No.  But what I meant -- yes.  But what I'm asking is before

7  you were caught, were you living here in this area?  Were you

8  working?  What were you --

9  A   Yes.  I was -- I lived here in the area.  I wasn't working

10  at that time.  I was getting help from my mom.  You know,

11  basically that's it.

12  Q   Okay.  I'm going to be asking you a few questions regarding

13  the time that you were caught.

14  A   Yes.

15  Q   If you don't understand my question, please let me know,

16  okay?

17  A   Okay.

18  Q   And I'll rephrase the question, okay?

19     On -- first of all, in this particular case, you have

20  already pled guilty and have been sentenced, correct?

21  A   Correct.

22  Q   And you were sentenced to how many months?

23  A   47.

24  Q   As part of that sentence, you had agreed to, in fact,

25  cooperate with the government, and that's through the assistance

1    of your attorney, correct?

2    A    Correct.

3    Q    And that's why you're here today?

4    A    Yes, sir.

5    Q    I'm going to be asking you questions about your arrest of

6    November the 5th of 2008 by DPS.

7    A    Okay.

8    Q    About a year-and-a-half or so ago.

9    A    Okay.

10   Q    Now, tell me, where were you stopped by DPS?

11   A    Where?

12   Q    Yes, where did --

13   A    Raymondville.

14   Q    In what vehicle?

15   A    Ford Expedition.

16   Q    And whose vehicle was that?

17   A    It was under my name.

18   Q    But how -- how is it that it came to be under your name?

19   A    Because a person who couldn't put it under his name, didn't

20   had a license.

21   Q    Okay.  And did you -- did you actually pay for it, or

22   somebody else paid for it?

23   A    No, somebody else paid for it.

24   Q    Who paid for it?

25   A    My co-defendant.

1    Q    Carlos?

2    A    Yes, sir.

3    Q    Okay.  And do you know how much he paid for it?

4    A    Not really.

5    Q    Then he put it under your name?

6    A    Yes, under my name.

7    Q    That was with your agreement?

8    A    Yes, because he said he was -- he was going to resolve his

9    problem for the license in a month.  He was going to change the

10   name in a month.

11   Q    Okay.  On this trip that you were arrested in, arrested for,

12   that -- that truck had some cocaine in it, correct?

13   A    I believe it was found.

14   Q    Well, you know it was found by DPS?

15   A    Yes, sir.

16   Q    Right?

17   A    Yes.

18   Q    Now, I want you to tell me what -- what you and he did

19   with -- where you-all went with that truck prior to you going on

20   the trip, okay?

21        First of all, let me start by asking you, did you have --

22   did you or Carlos have any work done on the truck prior to

23   taking off on that trip?

24   A    That same day, yes.

25   Q    Okay.  Where -- where was that work done?

1    A    That work was done at some auto part thing.  I don't know

2    how it's called in English.  Where they fix cars, auto service.

3    Q    So an auto repair place?

4    A    Auto repair place, yes.

5    Q    Or a garage or something like that?

6    A    Auto repair service.

7    Q    Where?

8    A    Southmost.

9    Q    That's here in Brownsville?

10   A    Yes, in Brownsville.

11   Q    So you're talking about the Southmost area?

12   A    Yes, sir.

13   Q    How is it that your truck was taken over there?

14   A    Because supposedly it was -- some kind of noise was here in

15   the front tires that I didn't recall at that time.  You know, he

16   told me that it had to be fixed, you know, and he knew a place

17   where he could take the truck.

18   Q    So prior to that, you didn't know about this place on

19   Southmost?

20   A    No.

21   Q    When did he tell you that this noise needed to be fixed?

22   A    That same day in the morning.

23   Q    Okay.  Did you take the truck over where he told you to take

24   it?

25   A    We both did.

```
1    Q    Okay.  And once you got to this place, did -- what was going

2    to happen to your truck as far as you knew?

3    A    They were going to fix the barrels from the tires in the

4    front.

5    Q    And did you stay there for the truck to be fixed or --

6    A    No.

7    Q    What did you do?

8    A    Well, we went out to the auto part store and bought the

9    parts.

10   Q    And then took them back?

11   A    Yeah, took them back to the auto service.

12   Q    How -- in what car or truck did you use to then go to the

13   auto parts store to get the truck -- to get the parts for it?

14   A    He was driving a King Ranch four doors pickup truck.

15   Q    So you-all went in separate vehicles to this place down on

16   Southmost?

17   A    Yes, sir.

18   Q    How did you know to get to that place?

19   A    I followed him.

20   Q    Okay.  So once your car is there, then you go in his vehicle

21   to get the parts?

22   A    Correct.

23   Q    Once you come back, leave -- do you leave the parts, or do

24   you stay there?

25   A    We left the parts.
```

1   Q   And then where do y'all go?

2   A   We were just going from car lot to car lot watching cars.

3   Q   Okay.  In where?

4   A   In Brownsville, Southmost.

5   Q   In the Southmost area?

6   A   Yes, sir.

7   Q   Is there -- there are a lot of car lots, small used car lots

8   over there, correct?

9   A   Correct.

10  Q   And did you-all eventually go back to see if the truck was

11  ready?

12  A   I think after he got a call.

13  Q   Okay.  And what happens once you go back to pick up your

14  truck?

15  A   We pick up the truck, and the people there told them that

16  the tires in the front were wasted.  They had to be replaced

17  because they were -- they were wasted.  So we went to Nava.

18  It's a tire shop.

19  Q   That's also on Southmost?

20  A   That's also in Southmost a few blocks away.

21  Q   Now, did you hear these people tell him that, or is that

22  what Carlos told you about the tires?

23  A   No, that's where we always have it.  He decided to go.

24  Q   But you didn't -- I'm sorry?

25  A   To go to buy the tires, get some new tires.

1   Q   But did you hear the people at the repair place tell Carlos

2   that you-all needed new tires, or did Carlos come and just tell

3   you that that's what he had been told?

4   A   Yeah, he told me.  Carlos told me.

5   Q   So you-all then go to Nava's?

6   A   Correct.

7   Q   And do you-all leave the truck there again to get the tires

8   worked on?

9   A   No.  We stayed there.

10  Q   Okay.  How long more or less?

11  A   More or less, I don't know, half an hour.

12  Q   Now, you said that sometime thereafter, you-all began your

13  trip up north, correct?

14  A   Correct.

15  Q   Who decided when it was time to actually leave to go up

16  north?

17  A   Him.

18  Q   And when you-all took off to finally head up north in your

19  truck, who was driving?

20  A   I was driving.

21  Q   Were you going to drive the entire time?

22  A   No, sir.

23  Q   What was the plan?

24  A   I was just going to cross over the checkpoint.  He was going

25  to take a nap.  He hadn't sleep all night the night before.