UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. B-08-CR-1248-02 |
| | . | CASE NO. B-08-MJ-1229-02 |
| PLAINTIFF, | . | |
| | . | |
| V. | . | BROWNSVILLE, TEXAS |
| | . | WEDNESDAY, NOVEMBER 12, 2008 |
| CARLOS MARTINEZ-TELLO, | . | 01:43 P.M. TO 02:22 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . . .


**PRELIMINARY EXAMINATION/DETENTION HEARING**

BEFORE THE HONORABLE FELIX RECIO
UNITED STATES MAGISTRATE JUDGE


**Trinity Transcription Services**
**61 North Bay Boulevard**
**The Woodlands, TX 77380**
**281-296-2290**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. B-08-CR-1248-02 |
| | . | CASE NO. B-08-MJ-1229-02 |
| PLAINTIFF, | . | |
| | . | |
| V. | . | BROWNSVILLE, TEXAS |
| | . | WEDNESDAY, NOVEMBER 12, 2008 |
| CARLOS MARTINEZ-TELLO, | . | 01:43 P.M. TO 02:22 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. B-08-MJ-1229-01 |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | |
| | . | |
| ROSARIO MARIA GARCIA-GARCIA, | . | |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . .

**PRELIMINARY EXAMINATION/DETENTION HEARING**

BEFORE THE HONORABLE FELIX RECIO
UNITED STATES MAGISTRATE JUDGE

Appearances:

For the Government:            Angel Castro, Esq.
                              Assistant United States Attorney
                              600 East Harrison Street
                              Brownsville, TX 78520

For the Defendants:

Rosario Maria Garcia-Garcia:  Reynaldo Cisneros, Esq.
                              Law Office of Reynaldo Cisneros
                              914 East Van Buren
                              Brownsville, TX 78520

```
Appearances (continued)

Carlos Martinez-Tello:          Anthony Troiani, Esq.
                                700 Paredes Line, Suite 107
                                Brownsville, TX 78520

Carlos Martinez-Tello:          Eduardo Lucio, Esq.
                                No Address Provided

Case Manager:                   Sally Garcia

Official Interpreter:           Ignacio Barrientos

Court Recorder:                 Balvina Campos-Guajardo

Transcriber:                    Cheryl Battaglia
                                Trinity Transcription Services
                                61 North Bay Boulevard
                                The Woodlands, TX 77380
                                281-296-2290
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

**TRINITY TRANSCRIPTION SERVICES**

<u>**INDEX**</u>

| <u>**WITNESSES:**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Redirect**</u> | <u>**Recross**</u> |
|---|---|---|---|---|
| **Richard Perez** | | | | |
| By Mr. Castro | 4 | | | |
| By Mr. Cisneros | | 13 | | |
| By Mr. Troiani | | 21 | | |

<u>**ARGUMENT**</u>

| | | | | |
|---|---|---|---|---|
| By Mr. Cisneros | 27 | | | |
| By Mr. Troiani | 27 | | | |
| By Mr. Castro | 27 | | | |

<u>**RULING**</u>

| | | | | |
|---|---|---|---|---|
| By the Court | 28 | | | |

1

1       **Brownsville, Texas; Wednesday, November 12, 2008; 1:43 p.m.**

2           **(Official Interpreter Present)**

3               **THE COURT:**  *B-08-1229, Rosario Maria Garcia-Garcia,*

4       and also *Carlos Martinez-Tello.*

5               **MR. CISNEROS:**  Reynaldo Cisneros for Rosario Garcia-

6       Garcia, your Honor.

7               **MR. TROIANI:**  Your Honor, Anthony Troiani for Carlos

8       Martinez-Tello.  And I believe that there's been another notice

9       of appearance of counsel, as well.

10              **MR. LUCIO:**  Yes, your Honor.  Eddie Lucio on behalf

11      of Carlos Martinez-Tello.

12          **(Pause)**

13              **THE COURT:**  Where is Miss Garcia-Garcia?

14          **(Pause)**

15              **UNITED STATES MARSHAL:**  Your Honor, I believe she --

16      we had her as waived.  I'll check on her.

17              **THE COURT:**  All right.  Mr. Carlos Martinez-Tello,

18      the Court had previously appointed Mr. Troiani to represent you

19      in this matter.  Is there a motion to substitute?

20              **MR. TROIANI:**  No, your Honor.  I believe it's a

21      Notice of Appearance.

22              **MR. LUCIO:**  There's a Notice for Appearance, your

23      Honor.  And obviously, they're looking to substituting counsel

24      this afternoon.

25              **THE COURT:**  All right.  Give me the background here.

2

1   Did you already talk to him?

2           **MR. LUCIO:**  Yes, I have, your Honor.

3           **THE COURT:**  And did you talk to him prior to --

4           **MR. TROIANI:**  I spoke with my client, well I spoke

5   with Mr. Carlos Martinez-Tello prior to the hearing today.

6   We're prepared to go forward.  I --

7           **THE COURT:**  Did --

8           **MR. TROIANI:**  I was just advised --

9           **THE COURT:**  Did you contact Mr. Troiani by talking to

10  him first?

11          **MR. LUCIO:**  I barely spoke to Mr. Martinez yesterday,

12  your Honor, after I filed a Notice of Appearance in the case.

13  I have not had an opportunity to speak to Mr. Troiani.

14          **THE COURT:**  I'm not going to grant your appearance in

15  this matter till you file the proper motions.  Your motion to

16  appear is denied.  Mr. Troiani, you're still in the case.

17          **MR. TROIANI:**  We're prepared to go forward.

18          **THE COURT:**  Let's go forward.

19          **MR. LUCIO:**  I understand, your Honor.

20          **THE COURT:**  All right.  Call your first witness.

21  Where's Garcia-Garcia?

22          **UNITED STATES MARSHAL:**  Your Honor, we printed out a

23  docket before we came up here.  She wasn't on the docket.  We

24  considered her waived.  I have the docket in front of me.

25          **THE CLERK:**  I'm looking into it, Judge.

3

1          THE COURT:  I'm sorry?

2          THE CLERK:  I'm looking into it.

3     (Pause)

4          THE COURT:  Have him join you at counsel table,

5  Mr. Troiani.

6          MR. TROIANI:  Yes, your Honor.

7     (Pause)

8          THE COURT:  All right.  Mr. Castro, call your first

9  witness.

10          MR. CASTRO:  I call --

11          THE COURT:  Mr. Cisneros?

12          MR. CISNEROS:  Yes, your Honor.

13          THE COURT:  We'll take your preliminary up

14  separately, I suppose.

15          MR. CISNEROS:  That's no problem.

16          THE COURT:  All right.  Go ahead.

17          MR. CASTRO:  Richard Perez.

18          THE COURT:  Mr. Perez, come forward.

19          Please swear him in.

20     (Witness sworn)

21     (Pause)

22          THE CLERK:  You can put your hand down.

23          THE COURT:  All right, sir.

24  //

25  //

**DIRECT EXAMINATION**

1

2    BY MR. CASTRO:

3    Q    Please state your name and tell us how you're employed?

4    A    Richard Perez, I work for Immigration and Customs

5    Enforcement.

6    Q    And as such, are you familiar with the case entitled

7    *United States of America versus Rosario Maria Garcia-Garcia,*

8    also known as Maria Rosario Vargas and Carlos Martinez-Tello?

9    A    Yes, I am.

10   Q    And is Mr. Martinez-Tello in the courtroom today?

11   A    Yes, he is.

12   Q    Would you point him out and identify him by an article of

13   clothing he's wearing?

14   A    He's sitting at defense counsel in the green jumpsuit.

15          **MR. CASTRO:**  For the record, your Honor, he's

16   identified Mr. Martinez-Tello.

17          **THE COURT:**  The record will so reflect.

18   BY MR. CASTRO:

19   Q    Now was Mr. Tello arrested as a result of a stop by the

20   Department of Public Safety on November 5th of 2008?  Is that

21   correct?

22   A    Yes, he was.

23   Q    And that was an initial traffic stop for following too

24   closely, I believe?

25   A    Yes, sir.

PEREZ - DIRECT                                            5

1  Q    Now at the time of the stop, the trooper who pulled over a

2  2003 Expedition that was being driven by the -- by Rosario

3  Maria Garcia-Garcia, correct?

4  A    Yes, sir.

5  Q    Records check also indicated that the owner of the vehicle

6  was Rosa Maria Garcia-Garcia?

7  A    Yes, it was.

8  Q    And the passenger in said vehicle was Carlos Martinez-

9  Tello?

10 A    Yes, sir.

11 Q    Did the trooper interview Miss Garcia regarding her travel

12 and her plans?

13 A    Yes, he did.

14 Q    At the time that he interviewed her did he notice any

15 signs in regards to nervousness or anything like that on this

16 date?

17 A    Yes.  He did notice that she was nervous during his

18 conversation with her.

19 Q    Was he able to determine her destination?

20 A    Miss Garcia was vague as to the details of her

21 destination.  But she indicated she was going to Beaumont to

22 visit her husband who's in prison.

23 Q    Did she also indicate --

24         **UNITED STATES MARSHAL:**  Your Honor, we still had her

25 downstairs.

PEREZ - DIRECT                                            6

1          **THE COURT:**  All right.  Have her sit with counsel.

2    Give her -- do you understand English --

3          **DEFENDANT GARCIA-GARCIA:**  Yes, sir.

4          **THE COURT:**  -- Miss Garcia?  Okay.

5       **(Pause)**

6          **THE COURT:**  Miss Garcia, we just started this

7    hearing.  So far the evidence shows that you were stopped by

8    the Department of Public Safety on a traffic violation.  You

9    were the drive or the vehicle and owner of the vehicle stopped.

10   And the officer's about to testify about his interview with you

11   now.  So you're up to date now, Miss Garcia.

12         Go ahead.

13   **BY MR. CASTRO:**

14   Q    Mr. Perez, is Miss Garcia sitting in the courtroom?

15   A    Yes, she is.

16   Q    Would you identify her by an article of clothing she's

17   wearing and who she is seated with?

18   A    Yeah.  Miss Garcia's sitting behind defense counsel, also

19   in a green jumpsuit.

20         **MR. CASTRO:**  For the record, your Honor, he's

21   identified Miss Garcia-Garcia.

22         **THE COURT:**  The record will so reflect.

23   **BY MR. CASTRO:**

24   Q    You testified that the trooper identified Miss Garcia-

25   Garcia as the driver and registered owner of the vehicle.  He

1  made contact with her, and asked questions about her

2  destination.  Correct?

3  A    Yes, sir.

4  Q    And you've testified that she was vague about her

5  destination.  Would you explain that?

6  A    Yeah.  According to the trooper, Miss Garcia was unsure as

7  to the location of where the prison was located.  She didn't

8  have an address.  She claimed to have a phone number, but that

9  she hadn't been in contact with him.  So she was en route to go

10 find out where he was.

11            **THE COURT:**  Location of who?

12            **THE WITNESS:**  Her husband.

13            **THE COURT:**  Okay.

14 **BY MR. CASTRO:**

15 Q    Her husband was supposed to be where?

16 A    According to her, he was in Beaumont at a federal facility

17 in Jefferson County.

18 Q    And did she inform the trooper when she planned to return

19 back to the Valley and be at work?

20 A    Yes.  She said she was going to come back the next day

21 because she had to be at work some time early afternoon.  The

22 stop was approximately 4, 4:14 in the p.m.  And she said that

23 the timeframe to get to the facility would have been about

24 eight to ten hours, which would have put her there somewhere

25 near midnight.

1              And in order to visit or find the details out of her

2     husband, she would have had to have left by at least six maybe

3     to get back in time, according to her statement to the trooper.

4     Q    So this -- this story and her nervousness made the trooper

5     believe that there was something fishy going on, correct?

6     A    Yes.

7     Q    Did he then speak to the passenger, Mr. Martinez?

8     A    Yes, he did.

9     Q    And did he inquire about the destination?

10    A    Yes.  Mr. Martinez was sitting in the passenger side.  And

11    he was, according to the trooper, fumbling the insurance and

12    title documents, and just there until he asked him questions.

13    Q    And did he exhibit any signs of nervousness besides the

14    fumbling of the documents?

15    A    Yes.  Trooper Pena also said that he appeared nervous to

16    him and he was fumbling in his speech.  And it appeared to the

17    trooper that he was, I don't remember his exact words, but it's

18    something to the effect that he was fumbling with the insurance

19    paper as if to read it, which caused me to remember when I

20    talked to him that Mr. Martinez cannot read English.

21    Q    Okay.  Did the trooper get any other information regarding

22    the relationship between both defendants?

23    A    The trooper said that they were compadres was his term

24    when asked.

25    Q    At that time did the trooper ask the driver, operator,

1   registered owner for consent to search the vehicle?

2   A     Yes, he did.

3   Q     And was consent granted by Miss Garcia-Garcia?

4   A     Yes, it was.

5   Q     As a result of that consent, was narcotics found within

6   the vehicle?

7   A     Yes, it was.

8   Q     And how much was the amount found and where was it found?

9   A     It was found hidden underneath the dashboard in 13 bundles

10  wrapped in foil paper.  When we took it back to the office, it

11  weighed approximately 14.22 kilograms.  And it tested positive

12  for the properties of cocaine.

13  Q     Did that result in the arrest of both defendants?

14  A     Yes, it did.

15  Q     Did these defendants were taken where and how did ICE

16  become involved?

17  A     The defendants were transported from the highway north of

18  Conley (phonetic) Road to the DPS office in Raymondville.

19  After processing some of the, you know, the property, they

20  contacted ICE.  And ICE responded after the referral, contacted

21  the U.S. Attorneys Office who accepted prosecution in the case.

22  Q     By the way, did the trooper inquire as to when Miss

23  Garcia-Garcia had acquired the vehicle she was driving?

24  A     Yes.  She admitted to them that she had bought it in

25  August of this year.

1  Q    Okay.  Once ICE took over the investigation, did -- were

2  the Defendants read their rights?

3  A    Yes, they were.

4  Q    And were they spoken to?

5  A    Yes, they were.

6  Q    Did they agree to --

7           **THE COURT:**  Let me ask you a question before you go

8  on.

9           **MR. CASTRO:**  Yes, your Honor.

10          **THE COURT:**  You say that the marijuana was found

11 behind the dashboard?

12          **THE WITNESS:**  It was cocaine, your Honor.

13          **THE COURT:**  I'm sorry.  The cocaine?

14          **THE WITNESS:**  Yes.  It was bricks about that big,

15 about that thick, underneath the dashboard.  You just pull the

16 dashboard up and there's a compartment there, it's a factor

17 compartment.

18          **THE COURT:**  Was that found at the scene?

19          **THE WITNESS:**  Yes.  Well what happened was the

20 trooper, after receiving consent from Miss Garcia, the trooper

21 went to the vehicle.  And what caught his eye was that the

22 dashboard was, in his words was shiny.  It looked like it was

23 very clean and just been cleaned.

24          So he immediately went to that area.  He pulled the

25 rubber molding off and noticed that the screws had been

PEREZ - DIRECT                                    11

1  tampered with recently moved around.  He put his flashlight in,

2  and he could see a silver wrapping.  And at that time he

3  suspected that there were narcotics in the vehicle.

4          **THE COURT:**  That was at the scene.

5          **THE WITNESS:**  That was at the scene on the side of

6  the highway.

7          **THE COURT:**  And the actual dashboard was not removed

8  until it was back at the station, correct?

9          **THE WITNESS:**  Right.

10          **THE COURT:**  Okay.

11  **BY MR. CASTRO:**

12  Q    Did any of the Defendants agree to speak without an

13  attorney?

14  A    Yes, they both agreed to speak.

15  Q    And did you speak with Miss Garcia-Garcia?

16  A    Yes, I did.

17  Q    Did Miss Garcia-Garcia make any admissions?

18  A    No, she did not.

19  Q    What information did you acquire from Miss Garcia-Garcia

20  regarding her relationship with the co-Defendant?

21  A    Miss Garcia stated that she baptized Mr. Martinez' --one

22  of his sons.  They've known each other for at least ten years.

23  He has known her husband since he was six years old.  He's

24  currently living at her address, 6603 here in Brownsville,

25  Frontera (phonetic).

PEREZ - DIRECT                                        12

1          They are related only by padrenos (phonetic).  She

2    told the trooper it was her cousin.  Mr. Martinez' family and

3    children are residing with Miss Garcia at her residence.  And

4    they have a -- a history of knowing each other for a long

5    period of time.

6    Q    That was the extent of her statement?

7    A    No.  She gave details about where she was, and where she

8    was going, and just general things about that date.

9    Q    But no admissions as to the knowledge of the cocaine

10   within the -- the vehicle?

11   A    No.  She denied having knowledge that there was anything

12   there.

13   Q    Did Mr. Martinez-Tello make any statements in regards to

14   the -- regarding his relationship with the co-Defendant.

15   A    Yeah.  He confirmed of it that they had known each for

16   that long, and they were padrenos.  That he's known her husband

17   for -- since he was, you know, six years old.  They're both

18   from the same city in Mexico.  That he's living with her at the

19   moment.  His family's there.  That he oftentimes worked in

20   Louisiana and comes back here and lives with them.

21   Q    And did you verify as to whether Miss Garcia's husband in

22   federal custody, and what offense he's in federal custody for?

23   A    Yes, I did.

24   Q    And what was that?

25   A    Mr. Vargas is his name, Juan Vargas.  He's in the Bureau

TRINITY TRANSCRIPTION SERVICES

PEREZ - DIRECT/CROSS                                    13

1  of Prisons for transporting marijuana.  He's not, I know you

2  didn't ask me, but he's not in Beaumont.

3  Q     He's not in Beaumont?

4  A     No, he's not.

5  Q     Okay.  And where --

6  A     That's north, kind of by Houston.

7  Q     Oh, he's in Houston.

8  A     No.  He was in Houston, the Bureau of Prisons in Houston.

9  He's been transported -- transferred from Houston to the

10 facility in Pollack (phonetic), which is Louisiana as of

11 11/3/08.

12        **MR. CASTRO:**  I pass the witness.

13        **THE COURT:**  All right.  Let's start with

14 Mr. Cisneros.

15     **(Pause)**

16                     **CROSS EXAMINATION**

17 **BY MR. CISNEROS:**

18 Q     Good afternoon, Mr. Perez.

19 A     Good afternoon, sir.

20 Q     Were you present at the time the vehicle in question was

21 stopped?

22 A     No, I was not.

23 Q     Who was present at the stop?

24 A     Initially that would be Trooper Pena.

25 Q     Was he the only one present at the stop?

PEREZ - CROSS                                    14

1    A    Initially he was after the suspected narcotics were

2    located.  Other troopers were called in to help him.

3    Q    Do you know their names?

4    A    Yes, sir.  I have a copy of the Department of Public

5    Safety's offense report if you'd like that lists all the

6    individuals involved, the witnesses, and who can testify as to

7    the questions you're asking me.

8    Q    Would that be part of your report and investigation?

9    A    Yes, it will be.

10   Q    Will that be given to the agents in charge?

11   A    He has a copy.  And I have a copy for you.  I don't have a

12   copy for Mr. Martinez, but you can have that one.

13        **(Pause)**

14   A    Page five will have the list of witnesses.

15   Q    What was the probable cause for the stop?

16   A    The trooper indicated that Miss Garcia's vehicle was

17   traveling too close to a vehicle in front of her.

18   Q    Was this in the right lane, or the passing lane?

19   A    I don't know which lane it was in, sir.

20   Q    Was it heavy traffic?  Was it light traffic?

21   A    I don't know.

22   Q    Would that have made a difference if she was riding too

23   close if traffic was kind of heavy?

24   A    You would have to ask the trooper, sir.

25   Q    And he's not here today.

1  A    No, he's not.

2  Q    You're only testifying as to what you've read today,

3  right?

4  A    I'm testifying as to what I've done since I began the

5  investigation.

6       **(Pause)**

7  **BY MR. CISNEROS:**

8  Q    Once the vehicle was stopped, you stated Miss Garcia-

9  Garcia was driving the vehicle?

10  A    That's correct.

11  Q    And you stated that she was traveling to Beaumont to see

12  her husband?

13  A    Yes.

14  Q    And you also testified that her husband was just recently

15  moved somewhere else, correct?

16  A    That's correct.

17  Q    And do you have documentation as to the exact date when he

18  was moved?

19  A    I contacted the Bureau of Prisons this morning after

20  looking up his information on the website, contacted the

21  Bollack detention facility in Louisiana this morning.  They

22  stated that he was transferred from Houston to Louisiana

23  arriving on 11/03 of '08.  I have a copy of that website print-

24  out in my case file.

25  Q    But he was transferred from Beaumont, Texas, correct?

PEREZ - CROSS                          16

1   A    They told me Houston.  They could not verify as to the

2   specific location, but based on the statements of the Defendant

3   standing that he was in Beaumont, Beaumont is close to Houston.

4   There's three separate facilities that are there.

5   Q    And where are those three separate facilities?

6   A    I don't know them off the top of my head.

7          MR. CASTRO:  Objection.

8          THE COURT:  I'm going to sustain.  You can get that

9   information.  It really doesn't go to probable cause.

10  BY MR. CISNEROS:

11  Q    So, in fact, her testimony was, in fact, credible, since

12  she was going to the Beaumont area, correct?

13  A    That's what she said she was going to do.

14  Q    And at that point, what other suspicion was Trooper

15  Pena -- what caused him to continue the investigation after she

16  cleared the reason for the stop, and with reference of where

17  she was going?

18  A    As I told Mr. Castro, the reason that he suspected was

19  that she was nervous, and that her story with regard to the

20  timeframe, the destination, the unknown destination, meaning

21  she didn't have the address.  She didn't know where she was

22  going.  All she knew she was going to visit her husband at a

23  facility that she had a phone number for.

24  Q    Would that phone number, once she gets to Beaumont, would

25  they give her directions to the facility?

PEREZ - CROSS                              17

1   A    I don't know.  She'd have to find it.

2   Q    So it's possible that she can arrive at Beaumont, call

3   that number, and they can tell her okay, you got to turn on

4   this street and this street to get to a facility?

5   A    Sure.  That's possible.

6   Q    So after that, what other suspicion did Mr. Pena have to

7   continue the investigation?

8   A    He asked for consent.

9   Q    Was that consent given, was it written consent?

10  A    It was verbal.  But you should be able to see it on the

11  trooper cam.  We don't have that yet.  It will be coming as

12  soon as it's available.  But it is there.

13  Q    So there's --

14  A    To the best of my knowledge.

15  Q    There's a video of the stop.

16  A    Of the stop.  Yes, there is.

17       **MR. CISNEROS:**  Your Honor, may I address the Court?

18       **THE COURT:**  Uh-huh.

19       **MR. CISNEROS:**  Judge, I know there's a policy of the

20  troopers to hold the video for a certain time and then record

21  over it.  Would the Court order that video not to be destroyed

22  so we can have an opportunity to review it?

23       **THE COURT:**  Mr. Castro, you making any efforts to

24  keep that video?

25       **MR. CASTRO:**  I believe they've already requested it.

1          THE WITNESS:  Yes.  We've already talked to the

2    detective, and he's processing it.  We should have it probably

3    tomorrow at the earliest.  But it is going to be kept and

4    recorded in its entirely.

5          THE COURT:  Thank you.  You'll be ordered to preserve

6    it.

7          THE WITNESS:  Yes, sir.  Thank you.

8          MR. CISNEROS:  Thank you, your Honor.

9    BY MR. CISNEROS:

10   Q    And once consent was given, you stated Mr. Pena conducted

11   a -- a search of the vehicle, correct?

12   A    After speaking to the second Defendant, he began his

13   search.

14   Q    And did he search the trunk of the vehicle?

15   A    I don't know which one he started, but the entire vehicle

16   was searched.  I remember when I asked him why it was he went

17   for that area.  And that's what I told Mr. Castro.

18   Q    And he went to that area because you said the dashboard

19   was shiny?

20   A    I said the trooper said that the dashboard was shiny.

21   Q    And that's why he searched that area, correct?

22   A    That's where he began.  That's where his suspicions were

23   aroused.

24   Q    Okay.  At that point, you said he could see something,

25   correct, under the dashboard?

PEREZ - CROSS                                    19

1    A    He told me that when he removed the lining, the rubber

2    lining, you could see the screws.  And the screws were tampered

3    with.  And there was an access point that he -- I think he

4    unscrewed it, or moved it, or flopped it to where he could

5    shine the light into a small hole or crevice.  And that's where

6    he could see the silver lining or the -- something that was

7    black in it.  I believe there was a black lining that was on

8    top and then the silver under.

9    Q    By looking at that, could he ascertain whether it was any

10   type of illegal substance?

11   A    I don't know.  But --

12   Q    Did he make a note in his report?

13   A    You have a copy of that report, I believe, that made him

14   suspicious based on his experience that narcotics are

15   transported in that manner.

16   Q    And at that point, had he determined -- did he decide to

17   take the vehicle somewhere else and conduct a more thorough

18   investigation of -- a more thorough search of the vehicle?

19   A    Ultimately, after the discovery, both the defendants were

20   placed under arrest.  He called for a back up.  A canine also

21   came.  And he alerted to the dashboard area.

22   Q    And where were -- where was Miss Garcia-Garcia transported

23   to from the scene?

24   A    To Raymondville, the DPS office.

25   Q    Was she Mirandized?

1  A    By whom?

2  Q    By anybody?

3  A    Yes.

4  Q    At the scene?

5  A    Yes.

6  Q    And at the station?

7  A    Yes.

8  Q    Did she provide a statement?

9  A    She was interviewed, but she did not provide a written

10 statement or a video taped statement.

11 Q    Did she give an oral statement?

12 A    Yes.

13 Q    Can you tell me the details of her oral statement?

14 A    They're pretty lengthy.  But they're based upon where she

15 was that day, where she was the following day, how often she

16 visited Mexico, when she visited Mexico, what her intent was,

17 where she was going, what she was going to do when she got

18 there, what she does for employment, family,  Pretty much, you

19 know, general statements.

20         Specifically, what you're asking is did she admit

21 that she knew there was -- no, she did not.

22 Q    I didn't ask that.  But thank you.

23 A    You're welcome.

24 Q    Did you -- was this in a controlled environment like in an

25 interview room?

1   A    It was in a large room, like a -- like there's several

2   desks there. But it wasn't in a small custodial room.   It was

3   in a large area behind the -- the DPS there.   Like there's the

4   secretary's office when you come in.   And there's an adjacent

5   area, but it's rather large.

6   Q    Is it --

7           **THE COURT:**  Mr. Cisneros, I've got to stop you here.

8   You're getting into discovery for suppression issues.   Stick

9   your questions to probable cause.   If you're finished, let's

10  get on with it.

11          **MR. CISNEROS:**  Yes, your Honor.

12          Judge, I have nothing further.

13          **THE COURT:**  Mr. Troiani?

14          **MR. TROIANI:**  Thank you, your Honor.

15      **(Pause)**

16                      **CROSS EXAMINATION**

17  **BY MR. TROIANI:**

18  Q    Good afternoon, Agent Perez.

19  A    Good afternoon, sir.

20  Q    It's my understanding that Mr. Carlos Martinez-Tello was a

21  passenger in the vehicle, correct?

22  A    Yes, sir.

23  Q    Okay.  It's also my understanding that he did not make any

24  statements acknowledging any type of knowledge or understanding

25  that there was any cocaine in the vehicle, correct?

1  A    That's correct.

2  Q    It's also my understanding that the vehicle was registered

3  to Miss Garcia-Garcia.

4  A    That's correct.

5  Q    It's also my understanding that she was actually operating

6  the vehicle; is that correct?

7  A    That's true.

8  Q    Okay.  It's my understanding that Mr. Martinez-Tello

9  indicated that he was traveling with his comadre to visit his

10  compadre, right?

11  A    That's correct.

12  Q    Okay.  Mr. Martinez-Tello did not have any contraband on

13  him?

14  A    No, he did not.

15  Q    Okay.  He had no warrants for his arrest at the time of

16  the stop?

17  A    No.

18  Q    He had no weapons on him?

19  A    No, sir.

20  Q    There were no weapons in the vehicle?

21  A    No, sir.

22      **(Pause)**

23  **BY MR. TROIANI:**

24  Q    Do you know if he has any understanding of the English

25  language?

1    A    He has some understanding.  He can speak it a little bit

2    and understand.  But I spoke to him in Spanish.

3    Q    Okay.  And it is common knowledge that when you're pulled

4    over by a trooper that most of the time they're going to ask

5    for your license and registration; is that correct?

6    A    Yes.

7    Q    Okay.  His limited understanding for the English language

8    would make it easy for him, or at least it would be -- he'd be

9    able to determine if there was insurance paperwork or other

10   paperwork in the vehicle?

11   A    Yeah.  He could do that.

12   Q    Okay.  And that's exactly what he did according to the

13   trooper?  Correct?  Is he provided the insurance paperwork for

14   the trooper?

15   A    I don't recall whether the trooper said that.  But he

16   did -- when I questioned him, the trooper, he said that

17   Mr. Martinez was fumbling through the paper as he went to talk

18   to him.  Whether he gave it to him initially, I don't know.

19   Q    And you'd -- it's not unusual for people to be nervous

20   when they're pulled over by the Highway Patrol whether or not

21   they have cocaine in the car or not, right?

22   A    No, sir.

23   Q    And it's not unusual for someone to reach for the license

24   and registration if they're pulled over by the Highway Patrol,

25   correct?

PEREZ - CROSS                                            24

1    A     Correct.

2    Q     Okay.

3          **(Pause)**

4    **BY MR. TROIANI:**

5    Q     The basis for the stop, the probable cause indicated by

6    the trooper was that Misses Garcia-Garcia was traveling too

7    close to traffic ahead of her on the highway, right?

8    A     That's correct.

9    Q     And according to the trooper, because you weren't there,

10   right?

11   A     Yes.

12   Q     According to the trooper, she allowed him to search the

13   vehicle.  Do you know what extent he gave her -- she gave him

14   as far as the permission to search the vehicle?

15          **MR. CASTRO:**  I'm going to object as to the search.

16   That's not an issue for probable cause.

17          **THE COURT:**  Sustained.

18   **BY MR. TROIANI:**

19   Q     Do you know if Mr. Martinez-Tello gave consent for the

20   trooper to search him or any of his goods in the vehicle?

21   A     I don't know.

22   Q     Okay.  But you are aware, or you've already testified,

23   that there was no contraband found on Mr. Martinez-Tello,

24   correct?

25   A     That's correct.

1        **(Pause)**

2    **BY MR. TROIANI:**

3    Q    Okay.  And there was no warrants issued or pending.  And

4    he was not the target of an outlook or some sort of agency

5    watch.

6    A    No.

7        **(Pause)**

8    **BY MR. TROIANI:**

9    Q    Other than his mere presence in the vehicle, there was no

10   reason to detain Mr. Martinez-Tello.

11   A    I believe what the hearing is supposed to do.

12   Q    Well I'm asking you.

13   A    You're asking my opinion?

14   Q    Well I'm asking, based on what we just talked about, he

15   doesn't have any warrants, right?

16   A    Just answering your question.

17   Q    Okay.  He doesn't have any warrants, right?

18   A    No, he does not.

19   Q    He didn't have any merchandise or illegal narcotics on

20   him, right?

21   A    No, he did not.

22   Q    He didn't make any affirmations or statements indicating

23   that he had any knowledge of the cocaine, correct?

24       **MR. CASTRO:**  Your Honor, I'm going to object.  Asked

25   and answered, at least twice, your Honor.

PEREZ - CROSS                           26

1        **THE COURT:**  That is sustained.  I think you made your

2   point, Mr. Troiani.

3        **(Pause)**

4        **MR. TROIANI:**  If I could just look -- take a minute

5   to look though the report, your Honor, I hadn't had a chance to

6   do that.

7        **(Pause)**

8   **BY MR. TROIANI:**

9   Q    Also, I believe you indicated that Mr. Martinez-Tello

10  indicated -- reported or stated that he had traveled or worked

11  in Louisiana and traveled back and forth between Louisiana and

12  the Rio Grande Valley; is that correct?

13  A    Yeah.  As of like a week before the date of the arrest.

14  Q    So it wasn't unusual for him to be traveling back and

15  forth between the Louisiana area and the Valley.

16  A    I don't know if it was unusual, but he did say he was

17  coming back, or that he had been recently back from work en

18  route to -- to Beaumont with Miss Garcia because he knew the

19  route, or the way, or the highway.

20  Q    Okay.  Thank you.

21       **MR. TROIANI:**  Pass the witness, your Honor.

22       **MR. CASTRO:**  Nothing else, your Honor.

23       **THE COURT:**  Any witnesses from the Defendants?

24       **MR. CISNEROS:**  None for Defendant Garcia-Garcia, your

25  Honor.

ARGUMENT                                    27

1          **THE COURT:**  All right.  You may step down --

2          **THE WITNESS:**  Thank you, your Honor.

3          **THE COURT:**  -- Mr. Perez.

4       **(Witness steps down)**

5          **THE COURT:**  Any argument from the Government?

6          **MR. CASTRO:**  I'll respond, your Honor.

7          **THE COURT:**  All right.  Then Mr. Cisneros?

8          **MR. CISNEROS:**  Yes, your Honor.

9          Basically, as to the probable cause for a stop,

10   there's no evidence presented where there was -- where there

11   was heavy traffic, slow traffic, the speed they were going.

12   Whether you're traveling too close to a vehicle is all relative

13   to all those conditions, your Honor.  And we'd argue that there

14   was -- none of that was presented in evidence.  And, therefore,

15   we ask that there's no probable cause for the stop.

16          **THE COURT:**  Okay.  Mr. Troiani?  You don't need to

17   say too much.

18          **MR. TROIANI:**  I wasn't going to, your Honor.  Just

19   very briefly.

20          Obviously, based on what was elicited from the stand,

21   there is no probable cause to detain Mr. Martinez-Tello, other

22   than mere presence.  We'd ask the Court to deny probable cause

23   as to him and have him released.

24          **THE COURT:**  All right.  Mr. Castro, rebuttal?

25          **MR. CASTRO:**  Your Honor, with regard to Miss Garcia-

ARGUMENT/RULING                                28

1   Garcia the issue of suppression of probable cause is not an

2   issue here today.  She was the registered owner and the

3   operator of the vehicle that contained the cocaine.  The Court

4   has heard the other evidence in this.

5            **THE COURT:**  All right.  Miss Garcia-Garcia, you'll

6   please rise.

7            Mr. Cisneros and Miss Garcia, I find that the

8   evidence -- that the evidence before the Court is sufficient to

9   establish probable cause in your case.  You're the driver of

10  the vehicle.  The vehicle was stopped at this particular point.

11           The Court has no other evidence, other than to state

12  on a proper traffic violation.  That upon the interviews with

13  you, the office made several observations about your person,

14  and about your passenger, and based on those things asked for a

15  consent to search, which led to the discovery of drugs.

16           I believe that that is sufficient probable cause to

17  allow the case to go to the Grand Jury.  And I so find in your

18  case.

19           Martinez-Tello, would you please rise?  Mr. Martinez,

20  the Court finds no probable cause in your case.  You are hereby

21  dismissed immediately.

22           **MR. TROIANI:**  Thank you, your Honor.

23           **THE COURT:**  All right.  Anything further?

24           **MR. TROIANI:**  May we be excused?

25           **THE COURT:**  Yes, sir.  You may be excused.

ARGUMENT/RULING                          29

1              Do we have a Detention Hearing in your case,

2    Mr. Cisneros?

3         **MR. CISNEROS:**  Yes, your Honor.

4         **THE COURT:**  All right.  Step here before the bar.

5         **(Pause)**

6         **THE COURT:**  Have you seen a copy of the Pretrial

7    Services report?

8         **MR. CISNEROS:**  Yes, I have, your Honor.

9         **THE COURT:**  And has the Government received a copy?

10        **MR. CASTRO:**  Yes, your Honor.

11        **THE COURT:**  Have you been able to discuss it with

12   your client, Mr. Cisneros?

13        **MR. CISNEROS:**  Yes, your Honor.

14        **(Pause)**

15        **THE COURT:**  Okay.  Mr. Cisneros?

16        **MR. CISNEROS:**  Yes, your Honor.  On behalf of Miss

17   Garcia-Garcia, your Honor, she is currently a -- she's

18   currently married.  She has three children.

19        **THE COURT:**  All that information's in the report.  Do

20   you have anything other than what is in the report?  I can read

21   the report, Mr. Cisneros.

22        **MR. CISNEROS:**  Your Honor, other than that, her

23   medical condition, Judge.  She has suffered two strokes, one

24   when she was a child and one approximately a year ago.

25        **THE COURT:**  What kind of stroke?

1          **MR. CISNEROS:**  I don't know the extent of it, Judge.

2     It's just what her mother had indicated to me.

3          She is currently taking medication for that.

4          **THE COURT:**  What is the stroke for, Miss Garcia?

5          **DEFENDANT GARCIA-GARCIA:**  Emotional.

6          **THE COURT:**  I'm sorry?

7          **DEFENDANT GARCIA-GARCIA:**  Emotional.

8          **THE COURT:**  Emotional stroke?  How do they manifest?

9     I mean, do you pass out?  Or do you have hear attacks, or what?

10         **DEFENDANT GARCIA-GARCIA:**  I pass out.  And it effects

11    the -- either the left or right side of the face.  I already

12    had them on both sides.  So either way on one side of the face,

13    and I just get like --

14         **THE COURT:**  They're not caused by any organic or

15    problem with the nerve -- simply -- is it all nerve related?

16         **DEFENDANT GARCIA-GARCIA:**  Yes.

17         **THE COURT:**  Is that what you're telling me?  Okay.

18         All right.  Go ahead.

19         **MR. CISNEROS:**  Your Honor, other than that, she does

20    have a home that's valued at $73,000 that she's willing to put

21    and.  And I don't know if her mother's also willing to sign it

22    as guarantor, that she would show up to Court and face these

23    charges if she were to be given a reasonable bond.

24         **(Pause)**

25         **THE COURT:**  Anything from the Government?

1        **MR. CASTRO:**  Your Honor, we would concur with the

2   recommendation from Pretrial recommending detention in light of

3   the nature of the offense, her family ties to Mexico.  Her

4   brother's in Mexico.  Her father's in Mexico, her unstable

5   employment history.  And she is a resident alien, so she likely

6   to be deported if she's convicted.

7        **THE COURT:**  Mr. Cisneros, she's got a mortgage of

8   $580 a month.  Her employment is sporadic at best.  The only

9   information that we have about any money you received if 50 to

10  $100.  Whenever business is good, from the Defendant's mother,

11  who helps selling blankets and curtains.

12       I imagine if you've got $580 a month on mortgage

13  bills, you also have utility bills, you've got children that

14  you have to send to school and feed and clothe.  How does she

15  do all this?

16       **DEFENDANT GARCIA-GARCIA:**  I was receiving food stamps

17  and Medicaid for the children.

18   **(Pause)**

19       **THE COURT:**  Anything else?

20       **MR. CISNEROS:**  No.  No, your Honor.

21   **(Pause)**

22       **THE COURT:**  How much drugs were involved here, 14.22

23  kilograms.

24       **MR. CASTRO:**  That is cocaine, your Honor.

25       **THE COURT:**  Cocaine.

1        **(Pause)**

2                **THE COURT:**  Miss Garcia, I'm going to find that there

3   is no condition, or combination of conditions, that would

4   reasonable insure your appearance in Court.  I have a great

5   concern about how you're supporting yourself and where those

6   funds are coming from.

7                I'm going to hold you without bond.  If you can get

8   any other explanations for me, Mr. Cisneros, I'll give you

9   another hearing on that.

10               **MR. CISNEROS:**  Thank you, your Honor.

11               **THE COURT:**  All right.

12       **(This proceeding was adjourned at 2:22 p.m.)**

1                          CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6

7

8         /s/Cheryl L. Battaglia                June 14, 2010

9            Transcriber                            Date

10   B-08-MJ-1229-02/B-08-CR-1248-02

11   11/12/08 - 06/14/10